# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of:

The Use of a Cell-Site Simulator to Locate the Cellular Device Assigned Call Number 858-413-6217 and International Mobile Subscriber Identity ("IMSI") 310120121107104.

)
)
)
)
)
)
)

Case No. 16-M-011

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B.

The basis for the search under Fed. R. Crim P. 41(c) is:
☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: 21 U.S.C. §§ 841 and 846.

The application is based on these facts: See Affidavit in Support of an Application for a Search Warrant. To ensure technical compliance with the Pen Register Statute, 18 U.S.C. §§ 3121-3127, this warrant also functions as a pen register order. Consistent with the requirement for an application for a pen register order, I certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by HSI and DEA.

☒ Delayed notice of 30 days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Erica N. O'Neil, Asst. U.S. Attorney
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: Jan. 15, 2016

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin        David E. Jones, U.S. Magistrate Judge
*Printed Name and Title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT

I, Jasemin Pasho, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique, which is described in Attachment B, to determine the location of the cellular device assigned call number 858-413-6217, (the "Target Cellular Device"), which is described in Attachment A.

2. I am a Task Force Officer with the Department of Justice, Drug Enforcement Administration (DEA) and a state certified law enforcement officer, currently assigned to the Milwaukee District office. TFO/Det. Jasemin Pasho is a federally deputized by the United States Department of Justice, Drug Enforcement Administration ("DEA"). Prior to my assignment with DEA, I have worked full time as a law enforcement officer for more than nineteen (19) years with the Milwaukee Police Department and currently employed in the rank of Detective. I am familiar with narcotics traffickers' methods of operation including the distribution, storage, importation, and transportation of narcotics, the collection of money which represents the proceeds of narcotics trafficking, and money laundering.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. One purpose of applying for this warrant is to determine with precision the Target Cellular Device's location. However, there is reason to believe that by 2:30 p.m. today, the

Target Cellular Device was be located somewhere within this district because the investigation to date as well as cell site data indicates that the device is currently en route to Milwaukee. Pursuant to Rule 41(b)(2), law enforcement may locate the Target Cellular Device outside the district provided the device is within the district when the warrant is issued.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of Title 21, United States Code, Section 841 and 846 have been committed, are being committed, and will be committed by Mister MCKINNEY and others. There is also probable cause to believe that the location of the Target Cellular Device will constitute evidence of those criminal violations, including leading to the identification of individuals who are engaged in the commission of these offenses and identifying locations where the target engages in criminal activity.

6. Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41. See 18 U.S.C. §§ 3121-3127. This warrant therefore includes all the information required to be included in a pen register order. See 18 U.S.C. § 3123(b)(1).

## PROBABLE CAUSE

7. In December 2014, Special Agent Edward Angeo with the Department of Homeland Security, Homeland Security Investigations initiated an investigation into the money laundering and narcotics trafficking activities of Joshua Moore operating in Southern California. Moore was identified as a narcotics trafficker and money launderer of proceeds thereof. Moore is currently on probation with the Orange County Probation Department for his March 31, 2014 conviction for marijuana trafficking in the Shelby Superior Court, State of Tennessee. Moore

2

also has a criminal history that includes an August 28, 2001 arrest for conspiracy to possess with intent to distribute methamphetamine and was sentenced to 60 months prison. On August 18, 2014, there was a seizure of approximately $310,000 and approximately 20 kilograms of cocaine that was seized from Moore's associates in Southern California. On September 11, 2014, there was a seizure of approximately $90,380 addressed to a business of Moore's associate in Southern California. On February 12, 2015, there was a seizure of approximately 64 pounds of marijuana from Moore's associate at an Amtrak train in Northern California. This same individual was encountered on May 14, 2015 in Omaha, Nebraska after 16 pounds of high grade marijuana was seized from an Amtrak train he was on board. On April 17, 2015, approximately $75,000 was seized from Moore at the General Mitchell Airport in Milwaukee, WI. On October 23, 2015, 60 pounds of marijuana was seized from Moore's associate in San Francisco who was enroute to Denver. On November 12, 2015, there was a seizure of approximately $80,000 from another Moore associate enroute to Los Angeles at an Amtrak in Chicago. During this investigation Mister **MCKINNEY** and Eric Frank were identified as suspected narcotics traffickers and money launderers through toll analysis of Moore's phone.

April 17, 2015 Seizure of Suspected Narcotics Proceeds

8. On April 17, 2015, SA Angeo was informed by Drug Enforcement Administration ("DEA") Los Angeles SA Garland that Milwaukee HIDTA seized approximately $75,000 from Moore at General Mitchell Airport in Milwaukee, Wisconsin. Moore was en route to board a flight to Los Angeles, California. SA ANGEO received the following information from DEA Los Angeles:

    a. On April 17, 2015, Transportation Security Administration ("TSA") Coordination Center at General Mitchell Airport in Milwaukee,

3

Wisconsin called the Milwaukee County Sheriff's Office ("MCSO") to report that Moore was at the Concourse D Checkpoint and was in possession of a large amount of United States currency hidden inside his jeans packed in his carry-on luggage. MCSO and Milwaukee HIDTA responded to Concourse D Checkpoint and met with Moore. A canine alerted to the luggage containing the currency, indicating the presence of an odor of a controlled substance emitting from the luggage. Milwaukee HIDTA seized approximately $75,000 U.S. currency from Moore's carry-on luggage.

b.  In addition to the currency, Milwaukee HIDTA seized numerous receipts for withdrawals and deposits of cash, almost all in amounts under $10,000, several suspected drug notes/ledgers with initials and dollar amounts, and three other cellular telephones.

c.  Moore also had in his possession the following: blank checks from Mister J **MCKINNEY**, DBA Allin POE, 2905 Inca Street, Unit 1066, Denver Colorado, US Bank account number XXXXXXXX0752; an envelope addressed to Moore from Allin Poe, 2905 Inca St #1066, Denver, CO; and a shipping invoice from PD Pack n Ship 640 St. Paul Avenue, Los Angeles with a sender listed as J. Moore, (714) 661-8699, 12534 Valley View, Garden Grove, California and a recipient of E. Frank, 3808 North Waterview, Tacoma, Washington dated April 2015.

9.  SA ANGEO reviewed tolls for Moore's phone from April 7 to April 13, 2015, which showed that Moore's phone had 392 contacts with phone number **Target Cellular Device**. An open source internet search for **Target Cellular Device** showed that Mister Jonathan **MCKINNEY** with an address of 2905 Inca Street, Unit 1066, Denver, Colorado is associated with this number.

4

a. SA ANGEO conducted a financial records search regarding **MCKINNEY**, which showed three CTRs filed in March 2015 with an address listed of 2905 Inca Street, Unit 1066, Denver, Colorado: a CTR dated March 11, 2015, showing a cash deposit of $12,000 into **MCKINNEY's** U.S. Bank account; a CTR dated March 19, 2015, showing a cash deposit of $14,000 made into **MCKINNEY's** U.S. Bank account with a listed occupation as owner of Allin Poe; and a CTR dated March 23, 2015, showing a cash deposit of $16,000 into **MCKINNEY's** U.S. Bank account with a listed occupation as owner of Allin Poe.

b. SA ANGEO conducted a records search in the HSI database, which indicated that **MCKINNEY** was identified in a 1998 Honolulu, Hawaii case as a suspected drug trafficker under investigation for methamphetamine smuggling. This is the same case wherein Moore was identified as a suspected drug trafficker.

c. SA ANGEO conducted a criminal records search, which revealed that on September 17, 2003, **MCKINNEY** was convicted of conspiracy to distribute methamphetamine in the United States District Court, District of Hawaii, for which **MCKINNEY** was sentenced to 46 months' prison.

d. SA ANGEO conducted a records search in the National Law Enforcement Telecommunications System ("NLETS"), which showed that **MCKINNEY** has a Colorado driver's license number 13-207-0128 with a listed address of 2905 Inca Street, #1066, Denver, Colorado.

10. SA Angeo's review of tolls for Moore's phone from August 5, 2015 to August 23, 2015, showed that Moore's phone had 84 contacts with the **Target Cellular Device**, subscribed and believed to be utilized by **MCKINNEY**.

5

11. SA Angeo's review of tolls for Moore's phone from August 5, 2015 to August 23, 2015, showed that Moore's phone had 32 contacts with phone number 206-290-6277, believed to be utilized by Frank.

12. On September 2, 2015, SA ANGEO learned that Frank, arrived at the Los Angeles Airport from Puerto Vallarta, Mexico. Further information revealed that Frank was inspected by Customs Border Protection (CBP) officers and was traveling with Darian FULLER (date of birth: 12/28/1975), Frank proclaimed as his long term girlfriend.

13. On September 10, 2015, SA ANGEO conducted a financial records check, which showed a CTR for a bulk currency withdrawal of $11,000 on January 23, 2015 made by FULLER from her Wells Fargo account number 878763307 (the same account number with FULLER's name that was listed in an outgoing text from a phone seized in Moore's possession along with the $75,000 on April 17, 2015).

14. On November 9, 2015, SA ANGEO learned that Moore was a co-signer for an application for surety bail bond for defendant Stephan MONTGOMERY. Moore listed his employer as ALLIN POE and occupation as a property owner. The total amount of bail for MONTGOMERY is $20,000 and the charges is listed as Section 11359 of the California Health and Safety Code, possession of marijuana for sale and Section 11360(a) of the California Health and Safety Code, possessing marijuana to sell or transporting to sell.

15. On November 11, 2015, SA ANGEO spoke with South San Francisco Police Department (SSFPD) Officer Miller. Officer Miller stated that he was the arresting officer for MONTGOMERY who was in possession of 60 pounds of marijuana in his hotel room and observed MONTGOMERY meeting with Frank prior to his arrest. Officer Miller stated that he

6

came in contact with Frank who declined to have his vehicle searched prior to MONTGOMERY's arrest.

16. On November 12, 2015 SA Angeo reviewed a copy of MONTGOMERY's arrest report provided by the SSFPD and learned the following information:

   a. On October 23, 2015, MONTGOMERY was contacted as the registered guest in room number 701 at the Travelodge, 326 South Airport Boulevard, South San Francisco, California. A records check of MONTGOMERY showed he had an active warrant for burglary and assault issued for his arrest out of Colorado with full extradition. A canine search of the room based on MONTEGOMERY's consent and incident to MONTGOMERY's arrest yielded approximately 60 pounds of marijuana (six 10 pound vacuum sealed bags) located inside four separate suitcases. The suitcases all contained dryer sheets to mask the odor of the marijuana. MONTGOMERY consented to a search of his cell phone and text messages indicative of marijuana trafficking were located.

   b. On October 23, 2015, at approximately 7:09 pm, Officer Miller was patrolling the 300 block of South Airport Boulevard and observed a silver Ford Escape bearing California license plate 7MJZ321 backed into a parking stall in the parking lot of the IHOP restaurant (316 South Airport Boulevard) with the headlights on. Officer Miller observed a male later identified as MONTGOMERY, standing near the driver's window speaking with the occupants of the SUV and shifting back and forth on his feet while looking around. The driver was talking on his cell phone and was later identified as Frank and the passenger was identified as Terrance WEBB. SSFPD officers observed MONTGOMERY and David OLIVER enter room 701 of the Travelodge. SSFPD officers obtained registry information for the guest registered to room 701 and

determined that it was registered to MONTGOMERY. Subsequent record check of MONTGOMERY showed an active arrest warrant out of Colorado for burglary and assault with nationwide extradition.

c.   Officer Officer Miller subsequently consensually contacted Frank and WEBB inside the vehicle. Frank advised he was in town from Washington to attend the San Francisco 49ers football game the previous night. Frank was planning on getting food at IHOP prior to going to the airport to fly back to Washington at approximately 10:00 pm. Both Frank and WEBB were clear and declined a search of their vehicle and persons and advised they would be leaving the area after being contacted by police. Frank provided telephone number 206-290-6277 as his contact number.

d.   Officer Miller and two SSFPD officers went to room 701 at the Travelodge and contacted MONTGOMERY and OLIVER. MONTGOMERY was immediately detained and Officer Miller observed four suitcases in a pile between the two beds of the room. MONTGOMERY stated that he had been in town to watch the Oakland Raiders football game (10/11/15) and was flying back to Colorado later that night.

e.   Officer Miller advised MONTGOMERY if he could search the room. Neither MONTGOMERY nor OLIVER many any protestations to the search and complied with all requests. A drug certified canine conducted sniff and immediately alerted to the pile of suitcases between the two beds in the room.

f.   Based on the canine alert, Officer Miller conducted a search on a blue Jessica Simpson duffle bag and located a large, vacuum sealed bag containing approximately ten pounds of marijuana. The duffle bag also contained numerous dryer sheets and ten Chase bank money bags. Officer Miller conducted a search on the remaining bags, a black Deux Lux duffle bag containing approximately ten

8

pounds of marijuana, a blue Skyline roller bag that contained two vacuum sealed bags, each containing approximately ten pounds of marijuana and a red Skyline roller bag the also contained two vacuum sealed bags, each containing approximately ten pounds of marijuana. All the bags contained numerous dryer sheets.

g.  Officer Miller located a Frontier Airlines plane ticketed bearing MONTGOMERY's name. The ticket showed MONTGOMERY flying from San Francisco Airport to Chicago O'Hare with the flight departing at 10:15 pm, in contradiction of MONTGOMERY's previous statement.

h.  Officer Miller located MONTGOMERY's cell phone (720-705-5677) and obtained consent from MONTGOMERY to search the phone.

i.  Officer Miller conducted a search of MONTGOMERY's cell phone and located text messages from two different contacts indicative of the trafficking and transportation of marijuana.

j.  The first text message conversation Officer Miller observed was from a contact of "JAY" with a phone number of the **Target Cellular Device.** The following are messages MONTGOMERY received from the **Target Cellular Device:**

- On October 21, 2015, at approximately 6:55 pm: "What's your rapid rewards number from southwest"
- On October 21, 2015, at approximately 7:16 pm: "You have to meet T first he gets in at 7:30 southwest flight"
- On October 21, 2015, at approximately 7:16 pm: "Your flight leaves at 8:25"
- On October 21, 2015, at approximately 8:30 pm: "Bring the roller and duffle"

9

- On October 21, 2015, at approximately 8:36 pm: "Don't forget it, it's important"
- On October 22, 2015, at approximately 4:43 am: "Don't forget to bring a roller and a the nice duffle bag."
- On October 22, 2015, at approximately 5:12 am: "Did you bring the roller back with you. My brother said you have duffel"
- On October 22, 2015, at approximately 5:13 am: "Look inside the roller you brought back with you"
- On October 23, 2015, at approximately 3:08 pm, "Jay" sent MONTGOMERY a photograph of a plane ticket for Frontier Airline flying from San Francisco International Airport to Chicago O'Hare and was a match to the ticket Officer Miller located.

k. Officer Miller located a second text conversation between MONTGOMERY and a contact of "JAY'S BRO" with a phone number of 714-914-7549. The following are messages the MONTGOMERY received from phone number 714-914-7549:

- On October 22, 2015, at approximately 7:06 am: "U make it without having to check anything?"
- MONTGOMERY responded by saying he had to check the roller in and that the other bag was with him.
- On October 22, 2015, at approximately 7:16 am: "When they have u do that take whatever we need out the roller and put in the duffle that way we have control of it"
- On October 22, 205, at approximately 4:19 pm: "Get that secured in room and the go to that Walmart to get the bags and c if u can get a Walmart card. I left bank bag in yo backpack"

10

- MONTGOMERY asked how much "JAY'S BRO" wanted him to take with him.
- On October 22, 2015, at approximately 4:48 pm: "Take 300 and u need like 2 boxes of large bags"
- On October 22, 2015, at approximately 7:49 pm: "U get card and material?"
- On October 23, 2015, at approximately 6:43 pm: "Can u go to that IHOP my guy needs to meet up with u to get that envelope"
- On October 23, 2015, at approximately 6:44 pm: "He will b there in 5 min. Just walk there and take him the enevelp"

17. Based on the subject matter of the text messages, Officer Miller believes that "JAY" arranged MONTGOMERY's trips by purchasing airfare for him, providing him with money, and telling him what baggage he would need for the trip. Officer Miller also believed that "JAY'S BRO" arranged meetings between MONTGOMERY and whoever was providing the marijuana in exchange for the money MONTGOMERY brought with him, as well as how to transport the marijuana east.

18. The subscriber information for the contact from MONTGOMERY's phone of "JAY" with the phone number of **Target Cellular Device** is subscribed to **MCKINNEY**.

19. Based on this investigation, SA ANGEO believes the guy mentioned in the text from 'JAY'S BRO" that MONTGOMERY met with at the IHOP is Frank, and believe the "envelope" is a code word for money and "300" is a code word for $300,000 that MONTGOMERY was instructed to give to Frank, who he me with at the IHOP.

20. SA Angeo conducted toll analysis for Moore's phone and learned the following:

11

a. From October 7, 2015 to October 22, 2015, Moore's phone had 18 contacts with MONTGOMERY's cell phone number.

b. On October 23, 2015, Moore's phone had five contacts with the **Target Cellular Device**.

c. On October 23, 2015, Moore's phone had 12 contacts with Telephone number 206-290-6277. Two of the contacts were at approximately 6:39 pm and 6:44 pm which was around the same time MONTGOMERY received a text his contact of "JAY'S BRO" with a phone number of 714-914-7549 that read "Can u go to that IHOP my guy needs to meet up with u to get that envelope" and "He will b there in 5 min. Just walk there and take him the enevelp".

21. Based on a previous narcotics investigation, Moore and **MCKINNEY** were identified as half-brothers. **MCKINNEY** had a contact name of "JAY" on MONTGOMERY's phone and based on this investigation, SA ANGEO believed the contact name of "JAY'S BRO" is Moore and that Moore along with **MCKINNEY** were coordinating the narcotics transaction that took place with MONTGOMERY.

22. Based on this investigation, SA ANGEO believes that Moore coordinated the meet between MONTGOMERY and Frank prior to the October 23, 2015 seizure in San Francisco.

23. SA ANGEO conducted toll analysis for Moore's phone and learned the following:

a. From November 3, 2015 to November 20, 2015, Moore's phone had 45 contacts with **Target Cellular Device**.

b. From November 3, 2015 to November 12, 2015, Moore's phone had 59 contacts with **Telephone number 206-290-6277**.

12

24. On January 8, 2016, MPD Det. Eugene Nagler received information from SA Angeo that Jonathan **MCKINNEY** was currently in Milwaukee Wisconsin. United States Postal Inspector James VanDePutte and Det. Nagler located **MCKINNEY** at General Mitchell International Airport, 5300 S Howell Ave, Milwaukee, Wisconsin. **MCKINNEY** was located at gate C-23 at approximately 10:10 a.m. **MCKINNEY** was wearing a white hooded sweatshirt, grey sweat pants and white tennis shoes (untied). **MCKINNEY** was observed with a carry-on, wheeled bag and a backpack. **MCKINNEY** appeared very nervous, his legs were bouncing. He was quickly looking around and was in continuous motion while seated. The flight was 1717 destined to LAX. Det. Nagler watched as **MCKINNEY** boarded the plane. Surveillance was ended.

25. On January 8, 2016, at approximately 1:30 p.m. **MCKINNEY** landed at LAX (Los Angeles CA) and a consensual encounter was initiated by CA LE, $64,660.00 was seized from **MCKINNEY** 's luggage.

26. Det. Nagler have been informed by SA Angeo that on January 14, 2016, **MCKINNEY** left Denver driving on Hwy 76N to Hwy 80E believed to be headed to Milwaukee. Based on cell tower information, I believe that McKinney stayed in Omaha, NE, last night, and that he started traveling east bound at approximately 7:30 a.m. on today. Based on cell tower information, distance, and rate of travel, Det. Nagler believes **MCKINNEY** should be in the Eastern District of Wisconsin by 2:30 p.m. on January 15, 2016. Based on the investigation to date, Det. Nagler believes that **MCKINNEY** is headed to Milwaukee to either deliver drugs or retrieve payment for drugs previously received.

13

## MANNER OF EXECUTION

27. In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

28. To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the Target Cellular Device or receiving signals from nearby cellular devices, including the Target Cellular Device. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the Target Cellular Device and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the Target Cellular Device and use that information to determine the Target Cellular Device's location, even if it is located inside a house, apartment, or other building.

29. The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Device, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the Target Cellular Device, and law enforcement will limit collection of information from devices other than the Target Cellular Device. To the extent that any information from a cellular

14

device other than the Target Cellular Device is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Device from all other cellular devices.

## AUTHORIZATION REQUEST

30. Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41. The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

31. I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days from the end of the period of authorized surveillance. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cellular Device would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

32. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cellular Device outside of daytime hours.

15

33. A search warrant may not be legally necessary to compel the investigative technique described herein. Nevertheless, I hereby submit this warrant application out of an abundance of caution.

Respectfully submitted,

JASMIN PASHO
Task Force Officer
DEA

Subscribed and sworn to before me
on: Jan. 15, 2016

DAVID E. JONES
United States Magistrate Judge

16

## **ATTACHMENT A**

This warrant authorizes the use of the electronic investigative technique described in Attachment B to identify the location of the cellular device assigned phone number 858-413-6217, a cellular telephone issued by Sprint, with International Mobile Subscriber Identity ("IMSI") 310120121107104, subscribed to Mister MCKINNEY.

## ATTACHMENT B

Pursuant to an investigation of Mister MCKINNEY and others for violations of Title 21, United States Code, Sections 841 and 846, this Warrant authorizes the officers to whom it is directed to determine the location of the cellular device identified in Attachment A by collecting and examining:

1. radio signals emitted by the target cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and
2. radio signals emitted by the target cellular device in response to radio signals sent to the cellular device by the officers;

for a period of thirty days, during all times of day and night. This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).